# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

### CASE NO. 18-CR-20989-[2] ALTMAN/GOODMAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHNNY GROBMAN, et al.,

    Defendant.

_____/

### ORDER ON DEFENDANT GROBMAN'S
### AMENDED MOTION FOR RELEASE PENDING SENTENCING

A federal jury convicted Defendant Johnny Grobman of all charges arising from a fraud scheme. United States District Judge Roy K. Altman remanded him to the U.S. Marshal's custody after the verdict, and Mr. Grobman is now in the Federal Detention Center ("FDC"), awaiting sentencing. His sentencing was scheduled for April 23, 2020, but he asked the Court to postpone it. Judge Altman granted [ECF No. 391] that motion and the sentencing is now set for June 17, 2020.

Framed by this background, Grobman has filed [ECF No. 387] an "Updated and Amended Motion for Release Pending Sentencing," which Judge Altman referred to me [ECF No. 383]. The United States filed an opposition response [ECF No. 390] and Grobman filed a reply [ECF No. 393].

1

Based on the unique circumstances presented here, the Undersigned **grants** the motion -- but with additional conditions and restrictions not mentioned in the motion. This order arises from Grobman's serious health issues, which place him in a high-risk category of dangerous and potentially deadly complications should he contract the rapidly-expanding COVID-19 Coronavirus.

So, the Undersigned is confronted with an extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for Grobman and others to practice the social distancing measures which government, public health and medical officials all advocate.

Because this Order arises from *one* defendant's individual medical condition, it should not be viewed as a determination that FDC is unable to adequately provide medical screening or treatment to its detainees, that detention at FDC is generally unsafe, or that detention there is generally inappropriate or unduly risky. This Order flows from a detailed and comprehensive bond package, which defense counsel have organized in an effort to demonstrate that Grobman is not a flight risk. Therefore, as noted, this is one ruling about one man involved in one fact-specific scenario.

I.  Grobman's Position

By way of summary, Grobman seeks release for five reasons: (1) he was convicted of only a "non-violent offense"; (2) "breaking events surrounding the Coronavirus"; (3) the shutdown of FDC to all visitors, including legal visitors, for at least 30 days; (4) Mr.

Grobman's health; and (5) "potential issues for appeal." [ECF No. 387, pp. 1-2].

Grobman's motion proposes three separate ten percent bonds totaling $2 million (one for $1 million, one for $850,000 and one for $150,000 -- with reinstatement of the $15,000 held by the Clerk in connection with the pre-trial bond) and two personal surety bonds totaling $1.5 million. The total bond package would be $3.5 million, and several co-signers, including his wife, would also be on the financial hook.

Concerning his health, Grobman advises that he is in an "at risk" category. [ECF No. 387, p. 2]. He is pre-diabetic and is being treated with metformin. *Id.* Significantly, he has been diagnosed with Discoid Lupus Erythematosus, an auto-immune deficiency disease which the Centers for Disease Control and Prevention has categorized as most-at-risk for contracting COVID-19. *Id.* The motion explains that his doctor said that his notes indicate that Grobman was "not suffering a Lupus outbreak at the time of his last visit," but "could suffer one at any time." *Id.* at p. 3.

Moving from his own medical condition to the conditions at FDC, Grobman alleges that confinement "creates the ideal environment for the transmission of contagious disease." *Id.* at p. 5. He says that he and other FDC prisoners are confined to their rooms for 22 hours per day. *Id.* He also alleges that no kosher food is being provided to him. *Id.* Although not expressly stated, Grobman's motion implicitly asserts that he keeps kosher for religious or health reasons (or both).

Grobman also notes that other attorneys have reported that "their client's access

3

to any medical services has been curtailed." *Id.* at p. 6.

Grobman's motion summarizes his health concerns with the following point: "There is no reason to risk Mr. Grobman's life for a sentence in a non-violent, first offense, fraud case, in which the loss amount is subject to serious dispute . . ." *Id.*

In addition to addressing his health concerns, Grobman alleges that his attorney's ability to review the Pre-Sentence Investigation Report "has been severely compromised." *Id.* As noted, Grobman's sentencing is now scheduled for June 17, 2020, and Grobman will undoubtedly need to have comprehensive discussions with counsel to prepare for the submission of a sentencing memorandum and for the sentencing hearing.

Grobman contends that he is not a flight risk. *Id.* This conclusion, he explains, is supported by the fact that travel both in and out of the country "is restricted and limited" and that "there is literally no place Grobman could flee to" because he lacks a passport and the country's borders have been closed. *Id.*

Not surprisingly, the United States sees things much differently than Grobman portrays them, and it opposes the motion.

II. Government's Position

The United States begins by pointing out that Judge Altman already rejected the Defendant's request for release before sentencing. [ECF No. 390, p. 1]. It describes the emergence of COVID-19 as the only new factor. *Id.* The United States argues that the existence of COVID-19 outside of FDC (where Grobman is confined) is not a basis for

4

release. *Id.* Significantly, the United States argues, this once-in-a-century virus does not amount to the clear and convincing evidence needed to overcome the presumption of detention. *Id.* In other words, the Government focuses on the applicable statute (28 U.S.C. § 3143) and argues that Grobman has not met its requirements for release.

III.   Factual Background

The United States describes this case as one involving Grobman's extensive scheme to defraud multiple victim companies of more than one hundred million dollars. *Id.* On August 23, 2019, the Defendant was charged in a 31-count Superseding Indictment with various crimes, including wire fraud, money laundering, theft of pre-retail medical products, and smuggling. *See generally* Superseding Indictment [ECF No. 132]. Grobman and two co-conspirators proceeded to trial.

Grobman describes it differently. He denies that the case is about a scheme to steal more than $100 million. To the contrary, he explains that the case is about "gray market sales of diverted products." [ECF No. 393, p. 2]. He points to the fact that "every company listed as a victim was paid for their products and paid an amount in which they received a profit." *Id.* Therefore, Grobman argues, the issue at sentencing will be "whether any company suffered a loss under the guidelines or whether profits of the defendants can be characterized a loss." *Id.*

On January 21, 2020, a three-week jury trial began. The United States represents, in its response, that the jury took less than half-a-day of deliberations to convict the

5

defendants of all charges. [ECF No. 390, p. 2]. Immediately following the jury's verdict, Judge Altman remanded Grobman to the custody of the United States Marshals Service. *Id.* Defendants' sentencing is currently scheduled for June 17, 2020.

Just before remanding the Defendant, Judge Altman heard argument from Grobman's counsel, who argued that Grobman should be allowed to remain on bond, contending that his family circumstances and compliance with the previous conditions of bond provided clear and convincing evidence that Grobman did not pose a flight risk. *See* Feb. 6, 2020 Trial Tr. at 16:17-17:3.[1] Judge Altman ordered Grobman be remanded, noting, "[T]hings are different once you get convicted at trial. Because until that point, hope springs eternal in human beings. And now after that point, I think it's understandable that things may have changed." *Id.* at 17:8-11.

The Presentence Investigation Report ("PSI") was disclosed to the parties. [ECF No. 378]. The PSI established that Grobman's guideline imprisonment term is **life** imprisonment. [ECF No. 378, ¶ 109].[2]

But Grobman argues that this advisory recommendation is substantially and

---

[1] The hearing transcript has not been posted on CM/ECF, so the Undersigned has not been able to review it. Therefore, I am quoting from the Government's opposition memorandum, as I have no reason to believe that the United States would purposefully miscite comments from a transcript. If Grobman has grounds to challenge the accuracy of the quotes provided by the United States in its opposition memorandum and used here, then he may file an appropriate motion.

[2] The United States mentioned the life term guideline in its publicly filed memorandum.

unfairly skewed, and he contends it is based on an over-representation of the actual harm in a gray market/diversion case. [ECF No. 393, p. 2].

To support this argument, Grobman relies on *United States v. Javat*, 18-cr-20668, a case which Grobman explains the United States has previously compared his case to during pre-trial conversations and hearings. *Id.* In *Javat*, United States District Judge Donald Middlebrooks held that the Advisory Sentencing Guidelines over-represented the actual harm and found a downward variance to 10 years, from a level 43 life sentence. *Id.* In doing so, Judge Middlebrooks explained the following at the sentencing hearing: "I think other guideline enhancements in this case operate together to produce an unreasonable sentence. And I also have some concerns . . . that the way the fraud guidelines have been ratcheted up by a number of events also lead, at least in this case, to an unreasonable sentence." *Id.* at pp. 2-3.

Before explaining my ruling, the Undersigned acknowledges the never-before-in-our-lifetime health crisis which the entire world is confronting with the COVID-19 pandemic.

So, let's be realistic about what's happening. The magnitude and speed of COVID-19's transmission is far greater than other flus or diseases which the world has battled in the last 75 years. As of now, there is no known treatment and a vaccine is, at a minimum, many months away. To say that the health risk is serious is to use an underwhelming adjective.

The Undersigned recognizes that Grobman (and likely many other FDC detainees) is concerned about his health. Anyone would be concerned. Similarly, there is no denying that COVID-19 has turned the world on its head.

Extraordinary times sometimes lead to atypical results. Factors which might be deemed comparatively insignificant in routine scenarios may now take on far-more importance. On the flip side, factors considered particularly relevant in a run-of-the-mill setting might generate only modest influence in an unprecedented time.

In our District, all trials, including criminal trials, have been stopped. All judges have been advised to conduct hearings by telephone or video conference, rather than to have in-person hearings. CDC-generated placards have been placed in many spots in our courthouses, admonishing all to wash their hands and practice social distancing.

The United States Attorney General issued a March 26, 2020 Memorandum, addressed to the Director of the Bureau of Prisons, giving guidance on how to grant home confinement to certain eligible inmates during the "present crisis" arising from "the pandemic currently sweeping across the globe." [ECF No. 395-1]. The Memorandum suggests that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement **rather than in BOP facilities**." *Id.* (emphasis added).

Therefore, the Attorney General's Memorandum explained, he wants to "ensure that we utilize home confinement, where appropriate, to protect the health and safety of

BOP personnel and the people in our custody." *Id.*

In fact, several federal judges have focused on the health crisis when issuing orders releasing Defendants from custody, including those, like Grobman, who are facing sentencing.

For example, in *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020), the Court discussed that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent." The Court further focused on the reality that "although there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop." *Id.* The *Stephens* Court noted that "though the BOP has admirably put transmission mitigation measures in place," it then explained that "substantial medical and security challenges would almost certainly arise." *Id.*

Similarly, in *United States v. Harris*, No. 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020), the District Court judge granted an emergency motion for release filed by a defendant facing sentencing after he pled guilty to distribution of child pornography. In doing so, the judge highlighted the fact that "the risk of the spread of the virus in the jail is palpable, and the risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real." *Id.*

IV. <u>Applicable Legal Standards and Analysis</u>

It is presumed that a defendant will be remanded into custody following a

criminal conviction. Under Title 18, United States Code, Section 3143, a defendant who has been convicted "shall" be detained pending sentencing "unless the judicial officer finds by **clear and convincing evidence** that the person is not likely to flee or pose a danger to the safety of any other person or the community if released[.]" 18 U.S.C. § 3143(a) (emphasis added).

The United States has not advanced the argument that Grobman would be a danger to safety of another or to the community if released, so this Order will not discuss that factor.

The emergence of COVID-19, combined with Grobman's at-risk medical status, militates in favor of the Defendant's release.

In addition to Section 3143, there is another federal statute which comes into play here: 18 U.S.C. § 3145(c), which provides that "a person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are **exceptional reasons** why such person's detention would not be appropriate." (emphasis added). The *Harris* Court recently relied on Section 3145(c) to enter an Order releasing a defendant pending sentencing. 2020 WL 1482342, at *1.

Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be

warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (applying 18 U.S.C. § 3145(c); collecting cases). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide **superior** care than a defendant can obtain on the outside. *United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999).

These cases, however, were not decided in the midst of a global pandemic which has killed thousands in two to three months and which appears to be spreading at an alarming and ever-increasing rate in the United States.

The Government notes that several courts have addressed similar motions for release based upon COVID-19 and still *denied* the defendant's release. [ECF No. 390, p. 7]; *see, e.g., United States v. Lewis*, Case No. 2:19-cr-00034-LMA-MBN, ECF No. 150 (E.D. La. Mar. 19, 2020); *United States v. Martin*, Case No. 1:19-cr-00140-PWG, ECF No. 209 (D. Md. Mar. 17, 2020); *see also United States v. Gileno*, Case No. 3:19-cr-00161-VAB, ECF No. 28 (D. Conn. Mar. 19, 2020) (denying wire fraud defendant's request in light of COVID-19 to serve remaining eight months of his sentence on home confinement); *cf. United States v. Stephens*, Case No. 15-cr-95-AJN, ECF No. 2798 (S.D.N.Y. Mar. 19, 2020) (granting bail in light of COVID-19 to defendant facing a hearing on supervised release violations, where defendant had not yet been convicted of violating supervised release and the hearing was scheduled for six days later).

The United States also relies on a decision from earlier this week in this district,

11

when United States District Judge James I. Cohn continued to detain pending sentencing a health care fraud defendant following his conviction at trial. [ECF No. 390, p. 7]; *United States v. Sebastian Ahmed*, Case No. 19-cr-60200-JIC (S.D. Fla. Mar. 24, 2020).

In *Lewis*, the Court was not convinced by the defendant's citation to articles discussing that jails are incubators for infectious diseases like COVID-19. *Lewis,* Case No. 2:19-cr-00034-LMA-MBN, ECF No. 150 (E.D. La. Mar. 19, 2020). The Court also noted that, if anything, the COVID-19 pandemic has *reduced* the availability of conditions to mitigate the risk of flight because probation officers will not be as efficient at monitoring. *Id.*

And in *Gileno*, the Court rejected the defendant's request, concluding that there is no showing that the FDC-implemented plan is inadequate to manage the pandemic at the facility in question. *Gileno*, Case No. 3:19-cr-00161-VAB, ECF No. 28 (D. Conn. Mar. 19, 2020). The judge could not assume that the BOP would be unable to manage the threat. Moreover, the Court reasoned, if the BOP is unable to manage the medical risk, then it would be duty-bound to release *all* prisoners who expressed vague concern about medical issues. *Id.*

There is no doubt that those cases undermine Grobman's position. But other, more-recent decisions, issued as the pandemic continues to worsen, support release under appropriate conditions. Grobman relies on the following cases:

1) *United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (*sua sponte* inviting Avenatti to **reapply** for release after denying his motion for the release, stating,

12

"[i]n light of the evolving nature of the Covid-19 pandemic, particularly in the greater New York City area, the Court invites Avenatti to apply *ex parte* for reconsideration of the Court's order" denying release).

2) *United States v. Michaels*, 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) (finding that COVID-19 is a "compelling reason" for release and that "Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)).

3) *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").

4) *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (*sua sponte* releasing detainee from immigration detention because "in light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers").

5) *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"); ("[T]he Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's

release to home confinement").

6) *United States v. Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in *sua sponte* order extending time to self-surrender because "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided").

7) *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19").

8) *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

9) *In re Manrique*, No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (authorizing release of former Peruvian president who is fighting extradition back to Peru to face trial on corruption charges as "[t]he risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail").[3]

Moving on from Grobman's medical concerns to the statutory requirement that he

---

[3] In authorizing release, the magistrate judge noted that the United States' treaty obligation to Peru "is to deliver him to Peru **alive**." 2020 WL 1307109, at *1 (emphasis added).

14

establish by clear and convincing evidence that he is not a flight risk,[4] the Undersigned is persuaded by his presentation under the special and exceptional circumstances presented here.

As part of the flight risk analysis, I am persuaded by Magistrate Judge Hixson's observation in *Manrique* that the flight risk concerns have "to a certain extent been mitigated by the existing pandemic." 2020 WL 1307109, at *1.

Grobman argues that he does not pose a flight risk because "he lacks a passport and country borders have been closed." [ECF No. 387, p. 6]. As noted by Magistrate Judge Hixson, "international travel is hard now." *In re Manrique*, 2020 WL 1307109, at *1. For example, "travel bans are in place, and even if Toledo got into another country, he would most likely be quarantined in God-knows-what conditions, which can't be all that tempting." *Id.*

Moreover, to further quote Magistrate Judge Hixson, "international travel would itself pose a risk of infection by likely putting [the defendant who has family and contacts in Peru, where he used to be president] in contact with people in close quarters." *Id.*

The United States contends that Grobman has "vast wealth," which means he would have money to travel by private air or sea travel to escape. [ECF No. 390, p. 8].

But the Undersigned is not convinced by the argument. After all, maybe the risk

---

[4] The Court must find by clear and convincing evidence that Grobman is not a flight risk under both Section 3143(a) and Section 3145(c).

15

of contracting COVID-19 is worth it to Grobman if he can escape and get away with it. But, to use a phrase from *Manrique*, "escape is riskier and more difficult now." *In re Manrique*, 2020 WL 1307109, at *1. As a 46-year-old man with Lupus and a pre-diabetic condition, Grobman might be giving himself a medical death sentence if he were to flee to Peru or another country with a less-sophisticated, less-modern and less-comprehensive health system than the United States and come into contact with a person carrying COVID-19.

The bond package proposed by Grobman, along with additional conditions I am imposing, will be sufficient to support the conclusion that there is clear and convincing evidence to demonstrate that he will not be a flight risk in the midst of a global COVID-19 pandemic.

The conditions of the release will be based on the following bonds and other restrictions, as outlined below:

1.  A $1 million personal surety bond signed by Grobman and his wife, Noemi. Neither Grobman nor his wife will be able to sell, pledge, mortgage or do anything to affect the title to the marital home which will serve as the collateral for this bond.

2.  A $1 million, 10% bond, signed by Abraham Vurnbrand. There will be a *Nebbia* requirement for the $100,000 which Mr. Vurnbrand will deposit with the Clerk.

3.  A $500,000 personal surety bond signed by Edy Gross, who will not be able to sell, pledge, mortgage or do anything to affect any interest she has in any real estate,

including her home at 2040 N.E. 211 Street, North Miami.

4. Alan Grobman will sign an $850,000, 10% bond, with $85,000 to be deposited with the Clerk. There will be a *Nebbia* requirement. In addition, Alan Grobman will sign whatever papers are necessary to continue the $150,000 10% bond which he signed at the start of the case. The $15,000 he posted then will remain with the Clerk. Alan Grobman will not be able to sell, pledge, mortgage or do anything to affect the title to any real estate in which he has any interest, anywhere in the world.

5. Grobman, his wife and his children will need to surrender their passports and travel documents to Pretrial Services and may not seek any additional passports or travel documents.

6. Grobman will be on home confinement, supported by electronic monitoring, with the costs to be paid by him and/or his family. He may leave only to attend required court hearings, to visit a hospital emergency room for his own medical emergency, or to meet with his attorney for a scheduled appointment.

7. Grobman may not visit any commercial transportation establishments, including airports, marinas, train stations or bus stations.

8. Grobman must arrange for his racing boat (and all other boats) to be removed from his waterfront home before he arrives there, and he may not get within 500 yards of it.

9. Grobman will need to report to Pretrial Services, as directed.

10. He must undergo substance abuse testing and/or treatment, as may be Required by Pretrial Services.

11. Grobman may not possess any firearm, ammunition or dangerous devices.

12. As a precondition to release, Grobman will submit to screening for COVID-19 by the BOP and/or the United States Marshals Service. If he is found to be exhibiting symptoms consistent with COVID-19 or is confirmed to have it, then he shall **not** be released.

13. If Grobman does not have COVID-19 or symptoms consistent with it at the time of his release, then he shall submit to screening for COVID-19 as directed by Pretrial Services. If he then or thereafter exhibits symptoms consistent with COVID-19, then he shall remain in quarantine or isolation, as directed by Pretrial Services, in a form directed by Pretrial Services, including self-isolation or self-quarantine.

14. During this period of pre-sentencing supervision, Grobman shall comply with all national, state and local public health orders regarding COVID-19.

V. Conclusion

The Undersigned **grants** the updated and amended motion, subject to all the terms and conditions listed above. If the United States wishes to appeal this Order to Judge Altman and seek a stay, then it shall file a brief notice of its intent by **March 30, 2020**[5] and

---

[5] The notice can be a simple one-notice submission, along the lines of "The United States is appealing the Order granting Grobman's post-trial bond motion and seeks a stay." At that point, the stay will be in effect. In other worlds, given the limited nature

then must file its motion/memorandum by **April 2, 2020**. At that point, Judge Altman can establish a briefing schedule if he deems it appropriate and can determine whether he will have a telephonic hearing or rule on the papers.

**DONE AND ORDERED** in Chambers, Miami, Florida, on March 29, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Roy K. Altman
All counsel of record

---

of the Court's daily operations, the Undersigned is giving an anticipatory ruling to grant a requested stay should the United States seek a stay in connection with an appeal.