**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-20989-CR-ALTMAN/Goodman**

**UNITED STATES OF AMERICA**,

    *Plaintiff*,

v.

**JOHNNY GROBMAN,** *et al.*,

    *Defendant.*
_____/

## ORDER

We've rejected Johnny Grobman's requests for pre-sentencing release twice already. Back a third time, Grobman adds several conditions that (he believes) will ensure his appearance and the safety of the community. But the Court isn't persuaded. For the reasons set out below, the Defendant's Corrected Motion to Reconsider Order Revoking Bond (the "Motion") [ECF No. 449] is **DENIED**.[1]

## THE FACTS

On February 6, 2020, following a twelve-day trial, a federal jury in this District convicted Grobman on all thirteen counts of the indictment against him. *See* Verdict [ECF No. 344]. The charges included wire fraud, money laundering, theft of pre-retail medical products, and smuggling. The evidence at trial showed that Grobman and three co-conspirators orchestrated a multimillion-dollar fraud, in which they purchased FDA-regulated products from American manufacturers at substantially

---

[1] The Motion is now ripe for adjudication. *See* United States's Response in Opposition to Defendant's Motion for Reconsideration ("Response") [ECF No. 456]; Johnny Grobman's Reply to Government's Response to Defendant's Motion for Reconsideration ("Reply") [ECF No. 457]. Grobman also filed a Supplement to the Motion ("Supplement") [ECF No. 459], and the Government filed a Response to the Defendant's Supplement ("Government's Supplement Response") [ECF No. 460]. Grobman then filed *another* Response in Support of the Motion ("Second Response") [ECF No. 463] and *another* Supplement to the Motion for Reconsideration of Bond ("Second Supplement") [ECF No. 482].

discounted prices by misrepresenting that the products would be shipped overseas to Suriname, when—in fact—they were selling the products in the United States. After the verdict, the Court remanded Grobman to the custody of the Miami Federal Detention Center ("FDC Miami") pending his sentencing, which is currently scheduled for August 26 and 27, 2021. *See* Paperless Minute Entries [ECF Nos. 336, 513].

This Court has—on two previous occasions—denied Grobman's requests for pre-sentencing release. *First*, after he was convicted at trial, Grobman moved the Court to let him out on bond. In support, counsel argued that Grobman's family circumstances and his compliance with the conditions of his bond demonstrated that he wasn't a flight risk. In rejecting counsel's position, the Court explained that "things are different once you get convicted at trial. Because until that point, hope springs eternal in human beings. And now after that point, I think it's understandable that things may have changed." *See United States v. Grobman*, 460 F. Supp. 3d 1331, 1334 (S.D. Fla. 2020).

*Second*, on March 20, 2020, while in federal custody, Grobman filed a renewed motion for bond, in which he proposed to sprinkle his home confinement with several new conditions and claimed that the COVID-19 pandemic justified his release. *See* Motion for Bond [ECF No. 382]. Again, this Court rejected his plea. *See Grobman*, 460 F. Supp. 3d at 1337. As the Court explained:

> Grobman has every incentive to flee: he is only forty-six years old, and he is facing a potential sentence of life in prison. Grobman also has all the resources he would need to effectuate his escape: he has significant foreign ties; he is extraordinarily wealthy; he has access to wealthy friends and family who have already agreed to put up millions of dollars for his release; and he has demonstrated a callous willingness—over many years—to defraud others and to disregard the law when doing so was in his own best interests. To give *this Defendant*, in *these circumstances*, a bond—because he has *inactive* lupus (of the skin) or because he may *one day* become diabetic—would be to allow (almost) every non-violent defendant in the country out onto the streets. This the Court will not do.

*Id.* at 1340.

## THE MOTION

Now, Grobman has moved a third time for release. In this Motion, Grobman offers three new

arguments—all unavailing.

*First*, Grobman contends that the COVID-19 pandemic has worsened since the Court last took up his request. Because of "deteriorating" conditions at FDC Miami, he says, he "has essentially been on a twenty-four-hour lockdown"; the "air conditioning has frequently malfunctioned"; he has "lost over twenty-five pounds"; and he's been unable to have "in-person meetings" with his lawyers to prepare for sentencing. Motion at 3–5. Notably, a few days after he filed this Motion, Grobman tested positive for COVID-19. *See generally* Supplement. Fortunately, Bureau of Prisons ("BOP") medical records indicate that he was "asymptomatic throughout his 14 day quarantine." Sealed BOP Medical Records [ECF No. 462], Ex. A at 7. Although Grobman quibbles with the assertion that he was *entirely* asymptomatic—he says he suffered "bodily pains and intestinal disturbance"—he concedes that he didn't have a cough or fever. *See* Second Response at 2. And he never suggests that he endured any of COVID-19's more serious complications—e.g., breathing trouble, chest pain, blood clotting— or that his life was ever in jeopardy. *See generally id.*; *see also* BOP Medical Records. Indeed, by all accounts, Grobman is fully recovered "and, after being quarantined, is presently not contagious." Second Supplement at 1.

*Second*, Grobman offers some additional release conditions. In his first motion, Grobman had suggested the following bond terms: (1) $3.5 million in bonds signed by Grobman, his family, and his friends; (2) the surrender of his and his immediate family's passports; and (3) home confinement with electronic monitoring. *See* Magistrate Order [ECF No. 397] at 16–18. Acknowledging now that his opening bid was too low, Grobman proposes to have two Rabbis monitor him via daily video conferences—one of whom is prepared to execute a personal surety bond. *See* Motion at 7–8. He also wants to hire two former DEA agents who will provide around-the-clock surveillance. *See* Supplement at 2.

*Third*, Grobman argues that his risk of flight should be balanced against the risk of death or

serious harm that his incarceration presents. *See* Motion at 8. He notes, moreover, that he has sold the yacht he could have used to escape and that counsel is holding the yacht's proceeds in trust. *Id.* Finally, he points out, his house stands just across the street from a police station—which, Grobman supposes, means that he "can literally be observed by standing on his front steps multiple times a day if required." *Id.* at 9.

## THE LAW

### I.   The Standard for Reconsideration

"Although the Federal Rules of Criminal Procedure do not specifically authorize motions for reconsideration, both the Supreme Court and [the Eleventh Circuit] have permitted parties to file such motions in criminal cases." *Serrano v. United States*, 411 F. App'x 253, 255 (11th Cir. 2011).[2] "In ruling on a motion for reconsideration in a criminal case, federal district courts apply civil standards and exercise substantial discretion." *United States v. Marcelina Orozco*, 2020 WL 3963719, at *1 (S.D. Fla. July 13, 2020). As in civil cases, "there are three major grounds which justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *United States v. Razz*, 387 F. Supp. 3d 1397, 1402 (S.D. Fla. 2019) (cleaned up) (quoting *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002)).

"A motion for reconsideration cannot be used 'to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.'" *Richardson v. Johnson*, 598

---

[2] *See also United States v. Phillips*, 597 F.3d 1190, 1199 (11th Cir. 2010) ("The government correctly points out that the Supreme Court and this Court have permitted motions for reconsideration in criminal cases notwithstanding the fact that the Federal Rules of Criminal Procedure do not expressly provide for them . . . ."); *United States v. Sabooni*, 2014 WL 4385446, at *1 (S.D. Fla. Sept. 4, 2014) (reviewing a motion to reconsider in a criminal case); *United States v. Gallo*, 2014 WL 1230717, at *3 (S.D. Fla. Mar. 25, 2014) (reviewing a motion to reconsider an order for pretrial detention); *United States v. Edler*, 2013 WL 4543695, at *1 (S.D. Fla. Aug. 27, 2013) (Rosenbaum, J.) (same).

F.3d 734, 740 (11th Cir. 2010) (quoting *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005)). The Eleventh Circuit has cautioned that "permit[ting] the unlimited renewal or reconsideration of fully decided motions would needlessly tie up judicial resources and seriously delay the final disposition of cases." *United States v. Gupta*, 363 F.3d 1169, 1174 (11th Cir. 2004). For this reason, courts have recognized that "[r]econsideration is an 'extraordinary remedy' that should be 'employed sparingly.'" *Marcelina Orozco*, 2020 WL 3963719, at *1 (quoting *Burger King Corp.*, 181 F. Supp. 2d at 1370).

## II. The Standard for Release

This Court has previously laid out the standards that govern the release of a defendant pending sentencing. *See Grobman*, 460 F. Supp. 3d at 1336–37. As we explained, 18 U.S.C. § 3143(a) sets forth two tests under which a defendant awaiting sentencing may be released. The first provides that a defendant "shall" be detained unless the defendant shows "by clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person." 18 U.S.C. § 3143(a)(1).

The second—a more stringent standard for defendants convicted of certain serious offenses—provides that a defendant "shall" be detained unless he shows *not only* (1) "by clear and convincing evidence that [he] is not likely to flee or pose a danger to any other person," *but also* (2) either (a) that "there is a substantial likelihood that a motion for acquittal or new trial will be granted" or (b) that the Government has recommended that "no sentence of imprisonment be imposed." 18 U.S.C. § 3143(a)(2). Although this second prong imposes a demanding standard, which few defendants can meet, § 3145(c) also offers an "exceptional-reasons safety valve." Under this safety valve, a defendant who satisfies the first prong (flee and danger) can bypass the second prong (acquittal, new trial, or no imprisonment) by "clearly" showing that "there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c).

Under either § 3143(a) or the safety valve (§ 3145(c)), Grobman bears the burden of proving—by clear and convincing evidence—that he is not likely to flee or pose a danger to the community. *See Grobman*, 460 F. Supp. 3d at 1336; *see also United States v. Harris*, 2020 WL 1503444, at *5 (D.D.C. Mar. 27, 2020) ("[E]ven when a court concludes that [the exceptional-reasons safety valve] is available, the Court must still determine whether there is clear and convincing evidence that the person is not a risk of flight and will not pose a danger to the community.").[3]

## ANALYSIS

For four reasons, Grobman hasn't carried his burden here. *First*, he hasn't relied on any intervening change in controlling law. *See generally* Motion. *Second*, as we explain below, he's marshalled only one new (and insignificant) fact. *Third*, he hasn't argued that our original decision was clearly erroneous or that reconsideration is necessary to "prevent manifest injustice"; nor, relatedly, has he shown any new or extraordinary circumstances that might warrant reconsideration. To the contrary, since he's developed COVID-19 antibodies, he's now inarguably safer than he was months ago, when he first filed the Motion. *Fourth*, and most importantly, Grobman still has failed to show, by clear and convincing evidence, that he isn't a flight risk.

We start with COVID-19 and Grobman's health. In our prior ruling, we found that Grobman had "not shown that his [medical] condition [was] at such 'an acute level warranting his release.'" *Grobman*, 460 F. Supp. 3d at 1339 (quoting *United States v. Esformes*, 16-cr-20549-RNS, at 3 (S.D. Fla. Apr. 9, 2020), ECF No. 1491). That hasn't changed. In fact, since filing the Motion, he contracted

---

[3] *See also United States v. Gerrans*, 2020 WL 1865420, at *1 (N.D. Cal. Apr. 14, 2020) ("The Court notes, even if there were 'exceptional reasons,' release under Section 3145(c) would not be proper unless the judicial officer finds by clear and convincing evidence that the defendant is not likely to flee . . . ."); *United States v. McDuffie*, 2020 WL 1659879, at *2 (S.D.N.Y. Apr. 3, 2020) (explaining that, under § 3145(c), a "bail motion can be granted only if there is (1) clear and convincing evidence that [the defendant] is not a flight risk or a danger to others and (2) an exceptional reason why his detention is inappropriate").

COVID-19 and recovered without medical complication. *See generally* BOP Medical Records; *see also* Second Supplement at 2 ("Mr. Grobman now reports to the Court that he is deemed to have recove[re]d from the disease[.]").

Recognizing that this recovery might undermine his argument, Grobman points out that he could be reinfected. *Id.* But, as our sister courts have repeatedly recognized, this risk is (very) small. *See, e.g.*, *United States v. Bullock*, 2021 WL 1550424, at *2 (S.D.N.Y. Apr. 20, 2021) ("Mr. Bullock himself tested positive for the virus in June 2020 and has apparently recovered, 'presumably reducing—if not eliminating—his risk of contracting the disease going forward.'" (quoting *United States v. Ayon*, 2020 WL 7401620, at *1 (S.D.N.Y. Dec. 17, 2020))); *see also United States v. Crawford*, 2021 WL 1535369, at *1 (W.D. Va. Apr. 19, 2021) ("Currently available data indicates that while it is possible for a person who has already had COVID-19 to become reinfected, reinfection is rare."). More than that, though, conditions around the country and within the federal prison system have improved since July of 2020. *See, e.g.*, *United States v. Haas*, 2021 WL 1546432, at *4 (E.D. Ky. Apr. 20, 2021) ("Impressive vaccination campaigns across the country are contributing to our slow return to some form of normalcy," and "states are administering about three million doses per day on average in the United States"). What's more, the BOP has (by last count) administered 151,619 vaccines to its inmates. *See* COVID-19 Vaccine Implementation, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Apr. 29, 2021). In other words, if Grobman hasn't received his shot already—a factor that would further moot his position—he's set to get one very soon. The situation is therefore not "deteriorating," as Grobman suggests, because inmates are far safer today than they were last summer. In short, if COVID-19 didn't justify Grobman's release last year, it cannot do so now.

In either event, Grobman again fails to show that he isn't a flight risk—reason enough to deny the Motion. As we've explained, under §§ 3143(a) and 3145(c), the Court "may not release a defendant *unless* that defendant has shown that he is *not* a flight risk." *Grobman*, 460 F. Supp. 3d at 1339. In

7

weighing this question (for a third time), we don't need to consider Grobman's *new* release proposals—i.e., that two Rabbis would monitor him through videoconferences, that one of those Rabbis would sign a surety bond, and that two former DEA agents would provide around-the-clock surveillance. Nor need we scrutinize his home's location vis-à-vis the police station. These are all things that Grobman could have offered as conditions in his first two requests for bond—a reality that dooms his efforts to renegotiate his release on a motion for reconsideration. *See Richardson*, 598 F.3d at 740 ("A motion for reconsideration cannot be used 'to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.'" (quoting *Michael Linet, Inc.*, 408 F.3d at 763)). To suggest otherwise would be to encourage defendants to litigate by iteration—to propose, in other words, the lowest possible bond and then to slowly up the ante, motion by renewed motion, until the Court's concerns are mollified.

But let's give the Defendant the benefit of every doubt and consider his new proposals anyway. And let's add to the mix the sale of his yacht, which is really the only new evidence he's marshalled here. None of this alters the result. Grobman still faces a life sentence; he was (and remains) convicted of a scheme premised on deception; he still has significant foreign bank accounts; much of his family (also with means) continues to live abroad; and he still has tremendous wealth in the United States (minus one boat).[4] *See Grobman*, 460 F. Supp. 3d at 1337–39. Grobman, in other words, still has the means and the motive to flee, and he has already shown a propensity for deceiving others and flouting the law.

The proposals, in any case, are mere ornamentation—the kinds of things people do and say

---

[4] As far as we can tell, Grobman still lives in a $10 million waterfront home and still has $6 million in his Bank of America and UBS accounts. *See Grobman*, 460 F. Supp. 3d at 1338; *see generally* Motion (not suggesting any change to his financial situation). Thus, while the sale of his yacht may be a "new" fact for purposes of a motion for reconsideration, it's hardly material. After all, given his resources, Grobman could easily buy (or have someone else buy) a smaller and less conspicuous vessel with which to make his escape.

to make us *feel* safer, even though we aren't. Grobman, remember, orchestrated a complex scheme to defraud sophisticated companies. As part of that scheme, he and his co-conspirators engineered false documents and filled giant cargo containers with an amount of sheet rock that mirrored (almost precisely) the weight of the baby food the containers were supposed to be carrying—all in a brazen (and, for years, successful) effort to evade the authorities. We don't think it's too much to suggest that this same man could figure out how to get away from two (retired) DEA agents *he himself* would be paying. *See* Supplement at 2. As James Madison once said, the "power over the purse may . . . be regarded as the most complete and effectual weapon[.]" THE FEDERALIST NO. 58. We have even less faith in the fortuitous presence of the police station—not because police officers aren't good at surveillance, but because we recognize that police officers are plenty busy keeping their communities safe; they don't have time to engage in the *pro bono* surveillance of a federal prisoner who happens to live across the street.

As for the Rabbis, one of them "has known Johnny Grobman and his family for over nine years," *see* Motion at 8—a relationship that, it goes without saying, didn't deter Grobman from propagating a multi-million-dollar fraud. The same is true of one of the DEA agents: Grobman was employing Manuel Recio as a private investigator *while he was committing these crimes*. *See* Government's Supplement Response at 4 (testimony of a former victim company employee who met with "Manny"—i.e., Manuel Recio, one of the two former DEA agents at issue here (quoting Feb. 4, 2020 Tr. Trans. at 221:9–15)).[5]

Nor does adding a former agent and a Rabbi alter this analysis. We haven't the power to direct the surveillance activities of agents-cum-investigators, and we couldn't hold them in contempt for letting Grobman escape (purposely or otherwise). *See United States v. Botero*, 604 F. Supp. 1028, 1035

---

[5] Grobman never rebuts this proposition. *See generally* Second Response; Second Supplement.

(S.D. Fla. 1985) ("[I]t is not entirely clear what authority and what duty a private guard would have to prevent [defendant's] flight. Certainly, this Court would be reluctant to hold such a guard in contempt if it appeared that he was unable to physically prevent [defendant's] flight.").

Ultimately, we reiterate that Grobman's "fundamental lack of respect for the rule of law" undermines his claimed willingness to abide by *whatever* bond conditions the Court might impose. *See United States v. Norman*, 2009 WL 464078, at *3 (S.D. Fla. Feb. 24, 2009). As we've said, he Grobman a powerful incentive to abscond; he has the means to get away; and he has people on the other side who would be happy to take him in.

\*\*\*

Having carefully reviewed the Motion, the record, and the governing law, the Court hereby **ORDERS and ADJUDGES** that the Motion [ECF No. 449] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 29th day of April 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record